Edwin H. Ewing, Special J.,
delivered tlie opinion of the Court.
The hill in this cause was filed in the Chancery Court at Clarksville on the 31st of January, 1853. The decree settling the rights of the parties was made at the April Term, 1856, of said Court, from which both parties appealed to this Court. The following facts appear from the record. In November, 1835, William B. Bartee, Clark M. Shelby, and Jesse A. Brunson, entered into partnership, intending to carry on the business of manufacturing iron. They were owners of about 1100 acres of land in Stewart county, upon which they proceeded to erect a steam forge, which was called “Byron Eorge.” At this forge they commenced business on the 4th of July, 1836, each partner having previously advanced as capital the sum of $3000. In the month of August, 1836, Shelby sold out his interest in the concern to Brunson, who soon thereafter sold one-half of this interest to Bartee, and thus Brunson and Bartee became sole owners and equal partners in the business. On the 30th of December, 1836, Brunson died intestate, leaving a widow, Louisa L. Brun-son, and nine children, all minors. On the 2d of January, 1837, Mrs. Brunson became duly qualified as administratrix of her deceased husband. On the 4th of January, 1837, Bartee executed a deed of trust to James H. Brigham as trustee, to secure a debt of $3330 to Shelby on his half of “Byron Eorge,” and lands, and four slaves, viz., Peter, Reeves, Herton, and Jane, said slaves being the individual property of said Bartee. On the 17th of February, 1837, Mrs. Brunson entered into articles of partnership with Bartee to continue the business during that year, she as *626 suming the ownership of half of the property owned hy her deceased husband, and bringing no new funds into the partnership. The business was thus carried on until the 19th of June, 1837, when Mrs. Brunson undertook, by a written agreement of that date, to sell to Bartee the one- * half of all the personal property, including debts due the firm, (except a debt of $1345 due by her husband to the firm,) said Bartee undertaking by the same agreement to pay all the debts due from the firm, and to assume all its liabilities, and release the debt due from Brunson’s estate. At the same time, and as a part of the same transaction, Mrs. Brunson executed her bond to the said Bartee, (upon which bond said Shelby was security,) binding herself that she would make, or cause to be made to him, a good and sufficient deed of conveyance or other assurance conveying to him all the right and title that the heirs of Jesse A. Brunson had to said lands and forge at the date of said bond, upon payment of the purchase - money. The con sideration for this agreement and bond to be paid by Bartee was $12,000, payable in three instalments of $4000 each, on the 1st days of January, 1838, 1839, and 1840.
It does not appear clearly what had been the whole cost of the lands, structures, and stocking, as it is called, of “Byron Forge,” though probably some $15,000 or $16,000. Nor does it appear clearly what were the debts of the several partnerships at the date of this sale, all of which were however assumed by said Bartee. They were probably seven or eight thousand dollars. Nor do the profits or other property of the partnerships besides the lands and forge clearly appear. From these causes, no satisfactory opinion can be formed in regard to the propriety of the trade, taking into view the question of value *627 alone. Whether the property was greatly enhanced in value or not we cannot undertake to determine. So far as appears, however, at the time of this sale of the Brun-son interest for $12,000, only $5000 had been advanced by Jesse A. Brunson or his wife, viz., $3000, their original share of capital, and $2000 paid for Shelby’s interest, and that Brunson’s estate was released from a debt in the agreement for sale of $1345, one-half .of his indebtedness to the firm. On the 19th of June above mentioned, Bartee, by deed of trust, conveys to said Shelby seventeen slaves belonging to him individually, including the four previously conveyed to Brigham, to secure Mrs. Brunson in the payment of the $12,000 aforesaid, for which Bartee had executed his notes, and also to secure her against liability for the debts of the previous firms to which she and her husband had belonged. Power was given to the trustee to sell upon default in payment or indemnity. On the 10th day of July, 1837, Mrs. Brunson, calling herself administratrix of Jesse A. Brunson, deceased, and as guardian for her infant daughter, Sarah A. Brunson, filed what she called her petition in the Circuit Court of Stewart county, praying that the -other children of Jesse A. Brunson, who were also minors, and of whom she was the general guardian, as she was also of said Sarah, might be made defendants thereto, and answer the same. She sets out in said paper that these children were the owners in fee of one undivided half of Byron Eorge and lands. Bartee, being owner of the other undivided moiety, states that this undivided half cannot be divided in the mode pointed out by law, and that it would be manifestly for the interest of said children that it should be sold. In this petition nothing is said of bond for title given *628 by her to Bartee, nor of her right of dower, nor is Bar-tee made a party. On the same day that this petition or bill was filed, it was answered by Mrs. Brunson, as guardian for her eight children, who are made defendants. And on the same day, another answer is filed for said defendants by one Cherry, calling himself guardian ad litem for said infants. These answers are in the usual .form of answers by guardians and guardians ad litem. Process had been on the same day served upon said minors, but the record does not show the appointment of any one as guardian ad litem for them. On the same day, the Judge of the Circuit Court makes his interlocutory decree, referring the matter to the clerk and master of the Court, who reports instanter that the sale would be proper, founding his report upon the testimony of three persons, one of whom is Shelby, Mrs. Brunson’s security in the title bond. They all state that they are acquainted with the lands and the number of heirs, and that in their opinion it would be manifestly for the advantage of the said children that the lands should bo sold. No other facts are stated by them. On the same day, an interlocutory order is made for the sale of the lands on the same credit upon which Bartee had bought from Mrs. Brunson. The interest of Brunson’s heirs in Byron Eorge and land was sold under this decree on the 1st of September, 1837, and bid off by Bartee at $9000. Bartee, on the 8th of the same month, assigned his bid to Mrs. Brunson. And at the next term of the Court a decree is made divesting title to the land, and vesting it in Mrs. Brunson, subject to a lien for the purchase-money. The above proceedings were had, we suppose, to place Mrs. Brunson in a condition to comply with her *629 bond to Bartee. Erom the date of this sale, Bartee seems to have carried on the business (iron in the mean time having fallen much in price subsequent to the sale) until March, 1888, when he died. During this latter time, Bartee was excessively intemperate in the use of ardent spirits, and his affairs were not in a prosperous condition. He died intestate, leaving a widow, who was a minor, and three minor children, who are the complainants in this cause. On the 3d of April, 1889, Robert Tompkins was appointed administrator of said Bartee, and gave bond with securities for the discharge of his duties. On the same day, William Phillips was appointed guardian for the children of Bartee, and gave bonds with securities for the discharge of his duties. Copies of both of these bonds are in the record. On the 10th of April, 1838, Phillips, as guardian of complainants, and Brigham, as trustee of Shelby, rented Byron Eorge for the residue of the year 1838 to Steel & Sox, for $950. On the 5th of May, 1838, Shelby, as trustee for Mrs. Brunson under the deed of trust of the 19th June, 1837, sold to Mrs. Brunson ten of the slaves conveyed to him, for the price of $5851. Previously to this sale, Shelby had transferred to Mrs. Brunson his debt against Bartee for $3330, securéd upon four of said slaves by the deed of trust of Bartee to Brigham. Four days after this sale, Mrs. Brunson transferred the same slaves at the same price to Shelby. Byron, one of the slaves mentioned in Bartee’s deed of trust for Mrs. Brunson’s benefit, was then dead, and Ben, another of said slaves, Was held by superior title by a third person. The price of these slaves was applied, as Mrs. Brunson says, to the payment of part of her debt of $12,000, and in part to her indemnity for debts of Brum *630 son and Bartee paid by ber. Abont this time, though the date is not precisely ascertained in the record, Tompkins, as administrator of Bartee, suggested to the County Court of Stewart the insolvency of Bartee’s estate. On the 1st July, 1838, an ex parte petition was filed in the Circuit Court of Stewart county in the name of the minor heirs of Bartee, by their guardian Phillips, by Robert Tompkins, administrator of Bartee, Brigham, trustee for Shelby, Mrs. Brunson and Shelby. This petition assumes that the whole of Byron Forge and lands belonged to Bartee’s heirs; states that they are also owners by descent of another tract of land in Stewart county, containing 640 acres; that the forge and lands are bound for the debt to Shelby and the $12,000 debt to Mrs. Brunson; that there are other debts for which said lands are liable; that the estate is probably insolvent; that it was manifestly for the interest of Bartee’s heirs that the forge and lands should be sold, as well as the 640 acres, and prays for a sale accordingly. To this petition the heirs of Brunson were not made parties. On the 3d of July, 1838, an interlocutory decree was made, referring to the clerk to report as to the necessity and propriety of said sale. The clerk reports on the same day the joint affidavit of two persons, who swear that they have heard the petition read; that the facts therein stated are substantially true; that it is necessary to sell the lands to pay off the debts, for want of sufficient personal assets; and that they think a sale for the interest of the heirs. The clerk does not report his own opinion. No account of debts or assets of Bartee is taken. On the same day, the Court makes an order to sell the lands, fixing the credits, and appointing a commission for the purpose. *631 On the 13th of October, 1838, the forge and lands were sold, and bid off by J. L. James for $5000. In November, 1838, an application was made by petition to open the biddings, alleging that the property had not sold for one-third of its value. The biddings were opened for thirty days, when, Mrs. Brunson having advanced some $600 on James’s bid, the property was decreed to her, and the price of the land was in no other way accounted for by her than in a credit upon her debt, arising out of the transaction of the 19th of June, 1837, and amount alleged by her to have been paid on partnership account.
On the 25th of January, 1840, Tompkins intermarried with Mrs. Brunson. At some time after said forge and lands had been decreed to Mrs. Brunson, and before the 22d of July, 1841, Mrs. Brunson sold them to James L. James for $6000; and on that day, she and her husband, Tompkins, joined in a quit-claim deed for them to James. On the 30th September, 1850, James sold and conveyed these lands, with other lands, the forge having in the mean time been greatly improved, to H. H. Hollister, for $20,000.
On the 6th of August, 1838, Tompkins, as administrator of Bartee, filed his bill in the Chancery Court at Charlotte, on behalf of himself and the widow and heirs of said Bartee, against Shelby, Mrs. Brunson, and other creditors of Bartee’s estate, alleging its insolvency, and praying to have it administered in that Court, under the provisions of the act in regard to insolvent estates, and praying for injunction, etc. The ordinary injunction was granted. In this bill, the proceedings for the sale of the forge and lands in Stewart county are mentioned, the sale of Mrs. Brunson to Bartee, and the debts of Mrs. Brunson *632 and Shelby. In the proceedings in said cause, no further notice is taken of these debts and transactions, and no account is taken between Bartee’s estate and Brunson’s. The first account indeed is taken after the marriage between Tompkins and Mrs. Brunson. By a decree of September, 1844, it is ascertained that the total assets for distribution are less than $4000, and the debts upwards of $8000. ■No account is taken or mention made of the slaves of Bartee mortgaged to Mrs. Brunson. This bill seems to have been pending in 1845, nor does it appear that the ■proceedings under it have been yet brought to a close.
On the 29th of January, 1889, Shelby, as trustee, sells four more of the slaves to Mrs. Brunson for $2930, which she in a short time thereafter transfers to him at the same price. Shelby also then sold mne of the slaves to one Napier. On the 25th of January, 1840, Shelby sold another of said slaves, Peter, to Mrs. Brunson, for $1075. Within a few days after this sale, TonSpkins intermarried with Mrs. Brunson, and they continued in possession of Peter until a short time (less than three years) before the filing ©f this present bill, when they sold him to Steel & Sox. On the 16th of December, 1848, Shelby sold the slaves transferred to him, except Beeves, to Hillman, Yan-leer & Co., who took possession of them, and have since held them, claiming them as their own, and without knowledge of the previous transactions in regard to them. Reeves was sold to Baxter about the same time, who received and held him under the same circumstances. No hire appears to have been accounted for of said slaves from the death of Bartee to the dates of their sales respectively, either by Tompkins or any one else.
It is stated in the bill that Phillips, the guardian, *633 appeared before the County Court of Stewart in January, 1843, and petitioned to be released from his guardianship, and that it appears of record that said' Court did make an order releasing him, but failed to appoint anothei guardian, and that no other guardian has been appointed. Phillips admits and insists upon this in his answer. The order discharging him is not in the record, nor does it appear that he' proved his accounts, nor that any other guardian was appointed. John H. Bartee came of age on the 25th of August, 1848, and Jasper Bartee on the 1st of January, 1850, more than three years before the filing of this bill. Andrew J. Bartee was a minor when the bill was filed. The widow of Bartee, who was a minor at his death, afterwards intermarried with one Lewis; and in 1847 a bill was filed by them in the Chancery Court of Clarksville, claiming dower in the real estate of ^ her deceased husband Bartee. This cause was brought by appeal to the Supreme Court of Tennessee at Nashville, and Mrs. Lewis was declared to be entitled to dower in the moiety of Byron Forge and lands, .originally owned, by Bartee, and her claim was settled by giving her an annuity, charged on this property, of $100 for life. Damages were also recovered by her for the detention of her dower. Mrs. Lewis is one of the distributees of John H. Bartee, deceased.
The bill in this case is filed by John H. Bartee, Jasper B. Bartee, and Andrew J. Bartee, as - heirs and next of kin of John H. Bartee, deceased, against Tompkins and wife, and the sureties of Tompkins, as administrator; against the heirs of Jesse A. Brunson, naming them; against James L. James and others, purchasers and occupiers of the real' estate sought to be recovered; and *634 against Lewis and wife, widow of Bartee, and ber bus-band ; against tbe beirs of Brigbam; against Phillips, guardian, and bis surety; against William Baxter, present possessor of one of tbe slaves; against Clark M. Shelby, cestui que trust under tbe mortgage to Brigham, and trustee in tbe mortgage of Bartee’s slaves for Mrs. Brunson’s benefit; and against Hillman, Vanleer & Co., purchasers of a portion of tbe slaves from Shelby, and of which they are now in possession; and against William B. Cherry, tbe commissioner who sold Bartee’s land. Tbe bill states that at tbe times of most of tbe transactions set forth in it, tbe complainants were infants of tender years, and that their information is therefore necessarily imperfect. They state, however, tbe partnership formed by their father with Brunson and Shelby; tbe sale of Shelby to tbe other two partners; Brunson’s death, and the continuation of the partnership with Mrs. Brunson; her sale to their father; the title-bond given; the deed of trust to secure the consideration; the proceedings in 'he Circuit Court of Stewart county to make good Mrs. Brunson’s title-bond ; the sales of the slaves by Shelby; the proceedings in the Court last mentioned for the sale of “Byron Forge” and lands; repudiating the use of their names in that proceeding ; the appointments of Mrs. Tompkins and Tompkins as administrators; the appointment of Phillips as guardian; Tompkins’s proceedings upon his suggestion of insolvency; and his failure to discharge his duty as administrator. They charge also, and' perhaps mainly rely for relief upon this charge, that their father, by his intemperance in the use of ardent spirits, had become imbecile and nearly non compos mentis, and that he was taken advantage of in this situation to procure from him what is called a most *635 unconscionable bargain in the purchase of Brunson’s half of the “Eorge property;” charging also combination and conspiracy for this purpose upon Mrs. Brunson, Shelby, and Tompkins, who were all, especially the first, exceedingly shrewd and skilful people in making trades. They charge that Mrs. Tompkins never did make their father any title to one moiety of the lands, and that the title-bond is void; and in general they charge most of the facts already stated in this opinion. They pray that the proceedings for the sale of their lands be declared null and void, and all things arising out of them to their prejudice ; that the sale of Mrs. Brunson to their father, together with all deeds, bonds, and conveyances arising out of it, be declared void. They pray to have their slaves restored, for rent and hire of land, for an account against Tompkins and Mrs. Tompkins of their dealings with said estate. They confine their claim of lands and rents, however, to one moiety of the land; and, finally, they pray for general relief. To this bill a demurrer was filed, as it appears by a judgment of the Court thereon, though the demurrer is not now in the record. The grounds of this demurrer, it is fair to assume, were misjoinder of parties and multifariousness, as we find these grounds taken and relied on in the answer. The demurrer was overruled, and leave given to defendants to rely upon the same matters in their answers. Whether the course was proper since the act of 1852, ch. 365, § 7, it is not necessary to inquire; though it may well be questioned whether, after judgment overruling a demurrer for multifariousness, the Court can, since the statute, look either to the bill or to any thing afterwards arising, as a ground for dismissal on that score. Was the bill as filed multifarious ? It is well *636 said by tbe 'Supreme' Court of the United States in the case of Gains vs. Chew, 2 Howard’s R., 619: “As to what constitutes multifariousness, it is impossible to lay down any general rule: every case must be governed by its own circumstances; and the Court must exercise a sound discretion on the subject.”
Neither the number of parties nor the intricacy of the claims on the one side or the other will render a bill multifarious. It is their disconnection or inconsistency, or the practical. inconvenience of considering them together, that renders it improper that they should be embraced under a single bill. Whenever a series of transactions have a common root or origin, and are so connected in the manner in which they transpire as that it is impossible to tell in advance what bearing one may hav¿ upon another, or how respective parties may be charged in reference to each other, embracing them under one bill would not subject it to the charge of multifariousness. See Story’s Eq. PL, §§ 284 — 286. Where a debtor, having many creditors, makes a fraudulent conveyance of different portions of his property to different grantees, and the property is further disposed of to different persons, not innocent purchasers, the creditors may all join in a bill against all the fraudulent grantees and those who may claim under them. Story’s Eq. PL, § 286. Again says Mr. Story, in § 539, Eq. PL, after stating that* there is no inflexible rule: “ It is not very easy a priori to say exactly what is, or what ought to be, the true line regulating the course of pleading on this point.” “In new cases, it is to be presumed that the Court will be governed by those analogies which seem best founded in general convenience and will best promote the due administration of justice.”
*637 It is conceded in argument that no good purpose could now be answered by sending this cause back and having separate bills filed, as, under the act of 1852, the result must be the same in any case. In any aspect, however, in which we can look at this case, whether as presented by the bill or as presented by subsequent developments, it is difficult to see how the rights of the parties could be properly settled without embracing them under one bill. The whole difficulty has arisen out of two deeds of trust executed, one to Shelby and the other to Brigham, by Bartee, and the contract upon which those deeds are founded. Brigham’s deed embraced a moiety of the lands of “Byron Eorge,” and four of the slaves included in the deed to Shelby. Bartee’s estate was insolvent, and all of his lands were subject to the payment of his debts. His slaves were sold under Shelby’s deed to various purchasers, for the payment of Mrs. Brunson’s debt. His lands were sold by the decree of the Circuit Court of Stewart for the same purpose.
It is doubtful whether the heirs of Brunson had been at all divested of their interest in the partnership lands. Tompkins and his wife, and his sureties, were concerned in establishing the validity of the sale of the 19th of June, for upon this might depend their liability to account. Phillips, the guardian, was interested in the same way, both as to the slaves and real estate; for to pay this debt both were sold. James and Hollister were equally interested as purchasers of the land. Lewis and wife were of course necessary parties as distributees. Clark Shelby was interested in the same way as Tompkins and wife, as purchaser of a portion of the slaves; and so of Hillman, Vanleer & Co.’s and Baxter. Brunson’s heirs were neces *638 sary parties to sustain or impeach, at their election, the transaction in pursuance of which their lands were sold; and Brigham’s administrator and heirs were proper parties — their father haying vested in him, by the deed of trust, the legal title to Bartee’s moiety of the lands, and being charged with aiding in a fraudulent sale of his property, in conjunction with others — to carry out the trade between Bartee and Mrs. Brunson. In this way the interests of all the defendants to the bill were connected, and in other ways unnecessary to mention. The bill should not have been dismissed for multifariousness, upon demurrer. Nor do the subsequent developments (if they could bear upon this question) materially alter the relations of the defendants to each other.
It is said, however, that the relief prayed for under this bill is rested exclusively upon the idea that Bartee was incapable, from mental imbecility, to make the contract of the 19th of June, 1837, or upon the idea that he was fraudulently taken advantage of by a conspiracy of shrewd, cunning, and unscrupulous persons, and induced to make the' trade by them in a manner that a Court of Equity would not countenance; that upon this view the testimony was taken, and to this alone was defendants’ attention directed by the statements in the bill; and that, to insist now upon other grounds of relief, is to take the defendants by surprise.
To the correctness of this position we do not assent. It is true that the charge most insisted on in the bill is the mental incapacity of Bartee, and the advantage taken of him by some of the defendants; yet the whole history of the case, as it now appears, was given in the bill. The material allegations have been already referred to, and *639 some of tbe matters, not distinctly stated in tbe bill, appear by tbe answers in more distinct form. There is a general prayer for relief, and no relief will be granted npon any matter wbicb does not appear distinctly in either tbe bill or answers.
These matters of form being thus disposed of, we will proceed to examine tbe merits of tbe case, and see if the complainants are entitled to any relief, and if so, to what extent.
Most of tbe answers deny that Bartee was incapable of making a contract from total loss of mind, and they as positively deny that any advantage was sought or taken of him in tbe contract of tbe 19th of June, 1837. They admit that be was in tbe habit of drinking ardent spirits freely, and sometimes to excess, but say that when not under tbe immediate influence of excessive drinking, be was competent to make bargains of any description. We have examined tbe proof upon this point, and come to tbe conclusion that tbe complainants have failed to make out a case either of mental incompetency or of fraudulent advantage taken. It is true, perhaps, that the contract, considering Bartee’s habits, and tbe state of the times in regard to money matters, was not a wise one. But it was such a one as many men might have "made who were habitually sober, and fully alive to all their interests. Nor in the transaction do we see any evidences of fraud or improper influence exercised. Mrs. Tompkins appears by the testimony to have been a woman of uncommon shrewdness, sagacity, and energy, but no improper use appears to have been made of these in- the trade. She is not shown to have possessed any special influence over Bartee, and he is shown to have been sober on the day of the trade.
*640 The price given, though it might seem large and even extravagant, from subsequent developments was such as is often given for such establishments, where the results are equally unfortunate.
The true objection to this contract stands, however, upon a different ground. Up to the date of this trade, we regard the partnership property to have remained as to title precisely as it stood at Brunson’s death. The partnership of Mrs. Brunson and Bartee, formed upon her assumption of ownership of her husband’s share in the concern, did not alter the relation of either to the property.
What was the effect of the contract of sale by Mrs. Brunson to Bartee, of the 19th of June ? She was then the guardian of her children, and binds herself by a penal bond to Bartee to have their title to the land vested in him, he being fully aware of her situation. How far such a bond by a stranger — the obligee being aware that the stranger has no title, but is binding himself at all hazards to procure the title of minors — would be binding, as not inconsistent with the policy of the law, we are not called on to say. A bond from one to another to convey him land, to which the obligor supposed himself to have title, but to' which he had no 'title in fact, would be good, and perhaps the obligor might use any lawful means to fulfil his obligation. Even then, if it should be disclosed to the Court that the sale of minors’ property was set on foot by the obligor, the application would probably be refused.
But how different is the attitude of Mrs. Brunson, guardian to her children! She assumes a position that compels her to act without reference to their interests. However their property might have been enhanced in value, *641 she was bound to have it sold and bought in at a certain price, or sustain a pecuniary loss. Such a bond we strongly incline to hold to be utterly void. If the bond itself, however, were not void, let us see what was done to make it effectual to Bartee. The petition to the Circuit Court to sell the moiety of the “ Eorge lands ” did not disclose this bond; whether intentionally or otherwise, does not appear. It was by Mrs. Brunson, claiming herself no interest in the land, and by her as guardian for one of her minor children against the other eight. She answers it as guardian for these eight children. It is also answered by Cherry, as guardian ad litem, he not appearing to have been so appointed; Bartee, the owner of an undivided moiety of the land, not being a party. Mrs. Brunson is reported as the purchaser, and thus becomes really a trustee for her children, and incapable of conveying to Bartee, who knows all the circumstances, any sort of title.
Certainly these proceedings were of no legal effect. If this be so, then the consideration for the contract of the 19th of June failed, and, as a consequence, all of the contracts that were made for its security fall with it, including the deed of trust to Shelby for the seventeen slaves.
The subsequent proceeding in the Circuit Court of Stewart county for the sale of the whole of the land as the property of Bartee’s children can have no better fate. It was instituted mainly to create a fund for the payment of the debt which we have already declared to have no validity. It is true other debts were referred to, and Shelby’s debt, which was valid, is mentioned in the petition. The Circuit Courts, since the passage of the act of 1835, ch. 20, § 1, have had no jurisdiction to sell real *642 estate of minors for the payment of debts in cases like the present. There was, in fact, no account taken of the debts.
The children of Brunson, who were the real owners of a moiety of the lands, were not made parties. The minors were made petitioners instead of defendants, and indeed there were no defendants to the proceeding. The sale under this decree was also utterly void, and communicated no title.
Pending this last proceeding, and before the sale, Tompkins, one of the petitioners, as administrator of Bar-tee, had filed his hill in the Chancery Court at Charlotte; and though he had in effect enjoined all suits at law and in equity, took no steps affecting the action of the Circuit Court, and permitted the sale to he perfected, and soon after intermarried with Mrs. Brunson, the purchaser of the land.
If the views here expressed had been taken of these proceedings at the time or shortly afterwards, but little difficulty need have arisen. By the lapse of time, the intervention of new interests, and the changes in the relation of the parties, great perplexity is thrown upon the case. No just account could now be had of the state of the several partnerships, of payments made, and the property used for that purpose. The books of the partnership were burned, as it seems, in 1851, while in the possession of Tompkins, administrator of Bartee, and husband to Brunson’s widow. Only a few scraps, and memoranda, and isolated facts remain. In any event, an account of the partnerships would now be barred, and the administrator of one of the partners is the husband of the adminis-tratrix of the other. Eor the same reasons, no payments *643 of partnership liabilities can be allowed Mrs. Brunson, for want of tbe means of taking a proper account. It is probable, however, that she need not much regret this, as she got in effect a release of her husband’s liability to Bartee of §1345, and the whole of the proceeds of the Bartee interest in the land, for which neither she nor her husband can now be held liable.
The only debt against Bartee’s estate that ean now be looked to with reference to the present parties, is that to Shelby, secured by the deed of trust to Brigham, which was upon four slaves, and Bartee’s interest in the land. This debt seems to have been transferred to Mrs. Brunson, and was probably first paid out of the sales of the slaves and lands; and for the purposes of this opinion it will be so taken.
By what has been already said, it will be seen that all of the sales of slaves by Shelby to Mrs. Brunson were void, as well as the sales to other persons. The titles to all of the slaves have, however, been perfected by the statute of limitations, Tompkins, the administrator, having failed to sue for them in proper time. Even the slave Peter, who was bought by Mrs. Brunson but a few days before her marriage, was bought, so far as we can see, without reference to that event. The ease of Henin vs. Marshall, 5 Humph., p. 443, would therefore not apply, as the statute had already begun to run. . Any claim to the other slaves would be barred upon another principle, that of the arrival of age of two of the legatees more than three years before the filing of the bill in this cause, and more than three years after the sales to Iona fide purchasers. Some attempt was made in argument to make Shelby and Mrs. Brunson liable as constructive trustees. *644 It is apprehended, however, that even if they stood in that attitude, the bar would still operate.
Tompkins, the administrator, is an express trustee, and .having failed to sue for and recover the slaves converted by Mrs. Brunson and Shelby, with full opportunity to do so, he must be charged with their value, subject to a deduction of the debt of Shelby, with interest to the date of the conversion. He must also be charged with so much of the rent of the real estate as was paid him by Phillips, being half of the rent received from Steel and Sox — say $475 — subject to a deduction of so much thereof as was applied by him, under the insolvent bill, to the payment of the creditors of Bartee. He must also be charged a reasonable hire for the slaves, from the date of his administration up to the date of their conversion by Mrs. Brun-son. He should also be charged with interest on these sums up to the present time; not, however, with compound interest, as his conduct, though subject to remark, is not regarded as fraudulent.
As to the real estate, the two complainants, John H. and Jasper Bartee, are barred by the statute of limitations, and can recover neither land nor damages for its detention. Andrew J. Bartee is entitled to recover one-third of the undivided moiety of his father in the “Byron Forge” and lands, subject to an annual charge of one-third of $100, Mrs. Lewis’s annuity. He is also entitled to recover against James and Hollister rent during the time they have each occupied said lands, to the same extent; that is, one-third of one-half, subject to a deduction of one-third of $100, on account of the dower. Rent is to be allowed him on the basis of the state of the property at his father’s death. Any improvements made *645 upon the property should be allowed, if they have permanently enhanced its value, as a set-off against rents, but no further.
In regard to Phillips, the guardian, it is strongly insisted that he cannot be held liable: first, because no relief is sought against him in the bill; and, secondly, because of his resignation in' 1843. The bill makes him a party, sets out his bond, and states his position, and prays for general relief against all parties. What is called his resignation does not appear, except by the statement in the bill and the admission in the answer. Erom these, it appears that no account of his guardianship was taken, and no steps taken to secure the estate, nor was any one appointed guardian in his place. When he purports to have resigned, every thing had been done by which the estates of his wards had passed wrongfully into other hands, and he had taken no steps to secure them. He is one of the sureties of Tompkins in his administration bond, a position somewhat inconsistent with that of guardian for the children, and in this way is liable personally for Tompkins’s default; but in this capacity his surety would not be liable for him. In the 3d vol. of Yerger’s Reports, this Court decided that an administrator might resign his trust to the County Court, one of the Judges dissenting; but in that case another administrator was appointed. See 3 Yerg., p. 375, McGowan and Wade. Also see case of Polk vs. Wisener, 2 Humph., 520.
We are of opinion that in this case the so-called resignation of Phillips was not effectual to denude him of his office, and that he still remains guardian of the minor, and was guardian of the two other complainants until they arrived of age.
*646 This will charge him, in case Tompkins and his sureties fail to make good the decree against him, with that liability, and also with two-thirds of the rents of the moiety of the lands owned by Bartee at his death, subject to deduction of two-thirds of Mrs. Lewis’s annuity up to the time when John H. and Jasper B. Bartee respectively arrived of age. It will charge him also with the rents which James and Hollister may fail to pay to Andrew J. Bartee, giving him the benefit of their improvements or of standing in their positions.
The decree to be rendered against Tompkins and Phillips will be also against their sureties respectively in their bonds.
The decree of the Chancellor will be reversed, and the cause remanded to be proceeded in according to this opinion.